UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 22-CV-751

| | |
|---|---|
| Muna AHMED, )<br><br>　　Plaintiff, )<br><br>v. )<br><br>)<br><br>CITY OF MINNEAPOLIS, a )<br>municipal entity; Minneapolis Police )<br>Officer DOE in their individual and )<br>official capacity, )<br><br>)<br>　　Defendants. )<br>　　　　　　　　　　　　　　　　　　 ) | COMPLAINT<br>SEEKING<br>MONETARY<br>DAMAGES<br><br><br><br>DEMAND FOR<br>JURY TRIAL |

## <u>GENERAL INTRODUCTION</u>

1.　This is an action under 42 U.S.C. § 1983 seeking monetary damages as compensation for Defendants' violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2.　Additionally, this action states common law claims of battery and negligence pursuant to MINN. STAT. § 466.02 against a Minneapolis police officer whose identity is not yet known, but who is referred to in this Complaint as Officer Doe or Defendant Doe.

3.　It is alleged that on May 26, 2020, a Minneapolis police officer, Defendant Doe, unreasonably seized Plaintiff's person violating her rights under the Fourth Amendment. Defendants' conduct also deprived Plaintiff of Due Process under the Fourteenth Amendment.

4.    Unconstitutional policies, customs, and/or practices were the driving force behind
      Defendant Doe's violation of Plaintiff's constitutional rights. These
      unconstitutional policies, customs, and practices include: (A) the City's custom or
      practice of exhibiting deliberate indifference to use of deadly force by the City's
      police officers when responding to civil disturbances, (B) the City's custom or
      practice of exhibiting deliberate indifference to use of deadly force in situations
      where deadly force is not justified, (C) the City's policy, custom, *and* practice of
      exhibiting deliberate indifference to the Minneapolis Police Department's
      ("MPD") use of 40mm less-lethal projectiles in crowd control and civil
      disturbance settings; (D) the City's policy authorizing the use of 40mm less-lethal
      projectiles in crowd control and civil disturbance settings; (E) the City's custom
      or practice of failing to train MPD officers not to discharge 40mm less-lethal
      projectiles indiscriminately into crowds; (F) the City's custom or practice of
      failing to supervise MPD officers who are discharging 40mm less-lethal
      projectiles to ensure they are not being aimed at face level or fired
      indiscriminately into a crowd; (G) the City's custom or practice of failing to
      discipline MPD officers who discharged 40mm less-lethal projectiles
      indiscriminately into a crowd or at face level, (H) the City's custom or practice of
      failing to discipline MPD officers who have used excessive force in violation of
      the Fourth Amendment.

5.    Defendant Doe committed a common law battery against Plaintiff for which the
      City of Minneapolis must assume liability under Minn. Stat. § 466.02.

6.      Defendant Doe owed Plaintiff a duty of reasonable care to not shoot 40mm less-

        lethal projectiles: (1) indiscriminately into a crowd, and (2) into a crowd at face

        level. Defendant Doe breached these duties by shooting a 40mm less-lethal

        projectile indiscriminately into a crowd at face level and striking Plaintiff in the

        forehead with a 40mm less-lethal projectile. Plaintiff was factually and

        proximately harmed by Defendant Doe's breach of duty. This constitutes

        common law negligence for which the City of Minneapolis must assume liability

        under Minn. Stat. § 466.02.

## **PARTIES**

### **Plaintiff: Muna Ahmed**

7.      Plaintiff Muna Ahmed [hereinafter "Muna"] was attempting to run errands on

        the evening of May 26, 2020.

8.      Plaintiff is a twenty-two-year-old female who resides in Minneapolis,

        Minnesota. She was twenty years old at the time of the incident.

9.      Muna was a student studying to become a surgical technician at the time she

        was struck by Defendants.

10.     Prior to being struck by Defendants, Muna's studies required her to take

        numerous fast-paced prerequisite classes during the summer of 2020 in order to

        continue her studies in Fall of 2020. Her summer classes started the same week

        she was injured by Defendants, and were only one month long. As a result of

        her injuries, Muna was forced to miss the first two weeks of class, and was only

able to complete her summer courses due to the compassion and courtesy of her professor.

### Defendant: City of Minneapolis

11.  Defendant City of Minneapolis ("Minneapolis" or "the City") is a municipal corporation duly organized and existing under the Constitution and laws of the State of Minnesota.

12.  The Minneapolis Police Department ("MPD") is a local government entity and an agency of Defendant Minneapolis, and all actions of the MPD are the legal responsibility of Minneapolis.

13.  Minneapolis is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal rights claims.

14.  Minneapolis Mayor Jacob Frey ("Frey") is, and was at all times relevant to this action, the Mayor of Minneapolis and the chief policy maker responsible for authorizing MPD's use of force.

15.  Minneapolis Police Chief Medaria Arradondo ("Arradondo") was at all times relevant to this action the MPD police chief and a policymaker for his department.

### Defendants: Minneapolis Officer DOE

16.  Muna is informed, believes, and thereupon alleges that MPD Officer Doe was the agent, servant, and employee of Defendant Minneapolis and the MPD.

17.   Muna does not yet know the true names and capacities of Defendant Doe and therefore sues Defendant Doe by fictitious name. Plaintiff will amend this Complaint to allege Defendant Doe's true name and capacity when ascertained.

18.   Defendant Doe is sued in both their individual and official capacities.

19.   For purposes of Plaintiff's claims under 42 U.S.C. § 1983, Defendant Doe is sued in their *individual* capacity. While Plaintiff also faults Defendant Doe the actions they performed in their *official* capacity, these harms are imputed to the City of Minneapolis and need not be realleged.

20.   For purposes of Plaintiff's state law claims, Defendant Doe is sued in their *official* capacity only.

21.   Muna is informed, believes, and thereupon alleges that Defendant Doe is factually and proximately responsible for the damages and injuries alleged herein.

22.   Muna is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Doe was the agent, servant, and employee of Defendant Minneapolis and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer.

23.   At all times, Doe Defendants were acting under color of state law.

24.   Muna is informed, believes, and thereupon alleges that the practices, policies, and customs of Minneapolis or the MPD caused the unlawful action taken against Muna.

5

## JURISDICTION

25.   This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction),

28 U.S.C. § 1343 (civil rights jurisdiction), 28 U.S.C. § 1651 (All Writs Act), 28

U.S.C. § 2201 (declaratory judgment), and 42 U.S.C. §§ 1983, 1988.

Supplemental jurisdiction over state claims is appropriate as the events in question

"derive from a common nucleus of operative fact." 28 U.S.C. § 1367; *United Mine*

*Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

## VENUE

26.   Venue properly lies in the District of Minnesota under 28 U.S.C. § 1391(e)(1)

because all the events giving rise to this claim occurred in this district. All

Defendants reside in this district, and no real property is involved in this action.

27.   On May 25, 2020, Minneapolis Police Officer Derek Chauvin knelt on George

Floyd's neck for more than eight minutes as Mr. Floyd's life slowly slipped away.

Despite Mr. Floyd's pleas for help and the protestations of onlookers, Officer

Chauvin and two other officers held him on the ground, handcuffed, until well

after he completely stopped moving, while a fourth officer prevented bystanders

from intervening to save Mr. Floyd's life. Mr. Floyd died on the street in

Minneapolis. He was suspected of attempting to pass a counterfeit $20 bill. Officer

Chauvin was convicted of second-degree unintentional murder under MINN. STAT.

§ 609.19 subd. 2(1), third-degree murder under MINN. STAT. § 609.195(a), and

second-degree manslaughter under MINN. STAT. § 601.205 on April 21, 2021. The

other three officers have since been indicted for aiding or abetting murder in the

second degree in violation of MINN. STAT. § 609.19. They have also been indicted

in federal court for violating Mr. Floyd's civil rights.

28.     On May 26, 2020, thousands of Minneapolis residents took to the City's public

streets and spaces to protest the killing of Mr. Floyd, as well as police killings of

other people of color. As city officials acknowledged, the vast majority of these

protesters exercised their First Amendment rights in a forthright, peaceful, and

lawful manner. On the evening of May 26, some protestors marched to the Third

Precinct on Lake Street and began to vandalize squad cars and the precinct itself.

In response, Minneapolis Police fired tear gas and rubber bullets into the crowd,

resulting in a skirmish that lasted hours.

29.     Muna arrived at the shopping center near the Third Precinct between 7:30 and

8:00 PM on May 26 with her sister, a friend, and her friend's brother.

30.     Muna was in the area with the intention to purchase items at the Lake Street

Target, but Muna found that the parking lot was blocked.

31.     The car Muna was in, which belonged to a friend, parked in the AutoZone so

that Muna and her group could try to walk to Target despite the lot being closed.

32.     Muna and her friends then started walking from AutoZone towards target, but

along the way they witnessed an exchange of projectiles between police and

protestors and decided to exit the area on foot.

33.     Muna and her group waited several blocks away for two hours until they

believed the conflict had ended, then made their way back to the AutoZone

parking lot on Lake Street to retrieve their vehicle.

34.   As they approached the parked car, they witnessed the police firing a projectile at a protestor, and began to run away, searching for cover.

35.   Muna realized that she did not know where her sister was, and turned to look for her. At that moment, Muna was struck in the head by a 40mm less-lethal projectile. Prior to being struck, Muna was seen flinching in fright as police indiscriminately shot 40mm projectiles into the crowd from across the street.

36.   When Muna was struck, she immediately began asking for help before falling to the ground, knocked unconscious by the blow to her head.

37.   Muna's injury was recorded by a bystander and was quickly published on social media that same night. Muna's family members saw the video and believed that Muna had been shot and killed, leading the family to experience great emotional distress.

38.   Police made no efforts whatsoever to provide medical aid to Muna. Instead, Muna's friends were forced to seek medical attention for Muna. Muna was taken in her friend's car to the hospital, with Muna going in and out of consciousness in the back seat while bleeding profusely from her head.

39.   Muna's friends report that they had to clean blood out of their car after Muna was delivered to the hospital.

40.   While her friends were driving to the hospital, they believed Muna was going to die. Everyone in the car with Muna was crying.

41.   Muna awoke in the hospital several hours later, where she received seven stitches and was prescribed pain medication.

42.     Muna was discharged to her family in the early morning of May 27, 2020.

43.     After being released from the hospital, Muna has suffered from debilitating
        headaches several times a week. She also experiences anxiety and panic when in
        groups of people or while driving her vehicle. She gets anxious and has chills
        when made to recount what happened to her.

44.     Muna had severe difficulties sleeping for weeks after this incident, as the pain
        and trauma were constantly being relived and replayed in Muna's head when
        she tried to sleep.

45.     Muna's face was extremely swollen for weeks after being struck by a 40mm
        projectile. Her face was so swollen as to cause her eyes to be nearly glued shut.

46.     The swelling also severely obstructed Muna's ability to eat. Muna was only able
        to drink liquids for 1-2 weeks until her facial swelling decreased. She lost a
        significant amount of weight during the two weeks following her injury as a
        result of her inability to eat.

47.     In order to get the swelling under control, Muna had to have an ice pack on her
        face and head constantly for weeks.

48.     Muna became extremely sensitive to light in the weeks following her injury,
        which caused her sleep schedule to shift drastically as she essentially became
        nocturnal.

### MPD's Custom of Excessive and Disproportionate Use of Force

49.     MPD officers have a long history of engaging in excessive force against the
        civilians they are sworn to protect. These incidents represent a custom that MPD,

and by extension Minneapolis, has long ignored and tacitly approved of.

50.    Minneapolis has exhibited a custom of failing to discipline MPD officers when

they use excessive force in violation of the Fourth Amendment, even after

Minneapolis pays large settlements to victims who were injured by MPD's

unconstitutional use of excessive force.

51.    MPD's use of excessive force is so widespread that the Attorney General of the

United States announced on April 21, 2021 that the "Justice Department has

opened a pattern or practice investigation into the City of Minneapolis (the City)

and the Minneapolis Police Department (MPD). The investigation will assess all

types of force used by MPD officers. … The investigation will also assess

whether MPD engages in discriminatory policing. As part of the investigation the

Justice Department will conduct a comprehensive review of MPD policies,

training and supervision. The department will also examine MPD's systems of

accountability, including complaint intake, investigation, review, disposition and

discipline."[1]

52.    It is likely that the DOJ's investigation into the MPD will result in a consent

decree that requires MPD to change its practices.

53.    Various reports have affirmed that MPD's use of less-lethal rounds during the

civil unrest following George Floyd's murder was inappropriate. According to

---

[1] *Attorney General Merrick B. Garland Announces Investigation of the City of Minneapolis, Minnesota, and the Minneapolis Police Department*, U.S. DEP'T OF JUSTICE (Apr. 21, 2021), https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-investigation-city-minneapolis-minnesota-and.

researchers at the University of Minnesota, 40 percent of the 89 patients treated after being injured by rubber bullets fired by police were shot in the head.[2] Dr. Douglas, Lazzaro of NYU Langone Health, noted that shooting rubber bullets "into open crowds is reckless and dangerous."[3]

54. Minneapolis has exhibited a custom or practice of failing to train or supervise the MPD officers who are allowed to file 40mm less-lethal projectiles. MPD has allowed officers who lack training on the 40mm less-lethal projectiles to use them in live crowd control settings. MPD has also failed to ensure that 40mm less-lethal launchers do not get passed from an officer who has sufficient 40mm launcher training to an officer who lacks that training.

55. Minneapolis has exhibited a custom or practice of failing to discipline MPD officers who violate the City's policies regarding the proper use of 40mm launchers.

56. Minneapolis' Use of Force Policies that were in effect on May 26, 2020 were a driving force behind Defendant Doe's unconstitutional use of excessive force.

57. Use of Force Policy § 5-317 addresses less-lethal 40mm launchers and impact projectiles. The policy states that these rounds are "used in situations where

---

[2] Jon Collins, *MN Researchers Found Less-Lethal Weapons Used in Floyd Protests Led to Serious Head, Eye Injuries*, MPR NEWS (Jan. 14, 2021), https://www.mprnews.org/story/2021/01/13/researchers-lesslethal-weapons-used-on-floyd-protesters-lead-to-serious-head-eye-injuries
[3] Liz Szabo, *What are Rubber Bullets? Weapons Used on George Floyd Protesters Can Maim and Kill*, KAISER HEALTH NEWS (June 3, 2020), https://www.nbcnews.com/health/health-news/what-are-rubber-bullets-weapons-used-george-floyd-protesters-can-n1223581.

maximum deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject."

58. Section 5-317 applied to officers who were not working in a SWAT capacity, indicating that SWAT officers can use 40mm launchers for additional purposes.

59. Section 5-317 states that "[t]he use of the 40mm less-lethal round should be considered a level slightly higher than the use of an impact weapon and less than deadly force *when deployed to areas of the suspect's body that are considered unlikely to cause death or serious physical injury*." (emphasis added). The negative implication of Section 5-317 is that 40mm less-lethal rounds should be considered equal to deadly force when deployed to areas of the suspect's body that are considered *likely* to cause death or serious physical injury.

60. Section 5-317 states that officers need to consider risks to the public or themselves prior to using *any* less-lethal options.

61. Section 5-317 explicitly states that "Officers shall not deploy 40mm launchers for crowd management purposes."

62. Section 5-317 provides that officers should avoid hitting "the head, neck, spinal cord, groin and kidneys" when using 40mm projectiles.

63. Section 5-317 requires officers who deploy a 40mm less-lethal round to report the force in accordance with § 5-306 and are required to immediately notify dispatch.

64.   Section 5-317 requires a supervisor to respond to the scene any time a 40mm less-lethal round is used. The responding supervisor shall review the incident and complete a use of force review in accordance with § 5-307.

65.   Section 5-305 provides that all Sworn MPD employees shall recognize that the use of a less-lethal weapon may constitute the use of deadly force.

66.   Section 5-312 permits MPD officers to use 40mm launchers and other less-lethal weapons "upon any individuals involved in a civil disturbance" once "authorized by the on-scene incident commander."

67.   The City's use of force policies identified above, individually and in combination, were a driving force behind Defendant Doe's conduct and use of excessive force. The City is aware that 40mm launchers deliver deadly force when used improperly, but nonetheless promulgated policies which allow 40mm launchers to be used in response to civil disturbances, which are akin to and a subset of crowd-control situations. The City's policy exhibits a deliberate indifference to the safety and constitutional rights of bystanders who are nearby individuals causing a civil disturbance. The City's policy likewise exhibits a deliberate indifference to the safety and constitutional rights of non-aggressive or compliant people who are in or near a civil disturbance and who are not jeopardizing the health and safety of officers or the public.

## INJURIES

68.   Muna suffered sustained a prominent midline frontal/forehead scalp hematoma and laceration when she was struck by a 40mm less-lethal projectile.

13

69. Muna received seven stitches from the medical staff in the emergency room. She could barely see due to swelling that forced her eyes to remain almost completely closed, she became extremely sensitive to light, her sleep schedule was severely disrupted, and she experienced weight loss from her inability to eat solid foods.

70. While at the hospital, Muna's clothing was taken from her for "evidence," and her clothes have still never been returned to her.

71. On June 5, 2020, Muna had her stitches removed and found the experience very painful.

72. After Muna's stitches were taken out, she had to spend a significant amount of time on a daily basis cleaning her head wound in order to guard against infection.

73. During the following weeks, Muna suffered painful facial swelling that made it nearly impossible to eat solid food. Head pain and emotional trauma led to Muna experiencing extreme insomnia for two to three weeks.

74. Muna now suffers from anxiety and panic attacks when driving or in the midst of large crowds as a direct consequence of being struck with a 40mm impact projectile. Her symptoms are consistent with symptoms of post-traumatic stress disorder ("PTSD"), anxiety, and depression.

75. Muna's fear and anxiety about reliving her trauma has stopped her from attending therapy and receiving mental health assistance. When thinking or

talking about attending therapy, Muna gets body chills and feels anxious and afraid.

76.    After being struck in the head by a 40mm impact projectile, Muna began regularly experiencing severe headaches. These headaches occur at least once per week, and often occur several times per week. The headaches are severely debilitating and often are so serious as to prevent Muna from being able to urinate or defecate during the headache. If these headaches continue, they will likely impact her ability to attain her dreams of working as a surgical technician.

77.    Based on the frequency of the headaches Muna is experiencing and her having been struck in the head by a 40mm impact projectile that immediately knocked her unconscious for a prolonged period of time, it is exceedingly likely that Muna experienced a traumatic brain injury ("TBI") as a result of Defendants' actions.

78.    TBIs are associated with both primary and secondary brain injuries. The primary brain injury refers to the sudden and profound injury to the brain that is considered to be more or less complete at the time of impact. Secondary brain injury refers to the changes that evolve of a period of hours to days after the primary brain injury and includes an entire series of steps or stages of cellular, chemical, tissue, or blood vessel changes in the brain that contribute to further destruction of brain tissue.

79.   Some TBIs can result in lifelong symptoms and permanent disability. Effects of brain injuries may include:

a.   Cognitive deficits such as confusion, shortened attention span, memory problems and amnesia, problem-solving deficits, problems with judgment, inability to understand abstract concepts, loss of sense of time and space, decreased awareness of self and others, and an inability to accept more than one- or two-step commands at the same time;

b.   Motor deficits such as paralysis or weakness, spasticity, poor balance, decreased endurance, inability to plan motor movements, delays in getting started, tremors, swallowing problems, or poor coordination;

c.   Perceptual or sensory deficits such as changes in hearing, vision, taste, smell, and touch, loss of sensation or heightened sensation of body parts, left- or right-sided neglect, difficulty understanding where limbs are in relation to the body, and vision problems, including double vision, lack of visual acuity, or limited range of vision;

d.   Communication and language deficits, such as difficulty speaking and understanding speech, difficulty choosing the right words to say, difficulty reading or writing, difficulty knowing how to perform certain very common actions (like brushing one's teeth), slow hesitant speech and decreased vocabulary, difficulty forming

sentences that make sense, problems identifying objects and their function, and problems with reading, writing, and the ability to work with numbers;

e.  Functional deficits, such as impaired ability with activities of daily living such as dressing, bathing, and eating, problems with organization, shopping, or paying bills, or the inability to drive a car or operate machinery;

f.  Social difficulties such as impaired social capacity resulting in difficult interpersonal relationships, difficulties in making and keeping friends, and difficulties understanding and responding to the nuances of social interaction;

g.  Regulatory disturbances such as fatigue, changes in sleep pattern and eating habits, dizziness, headache, loss of bowel and bladder control;

h.  Personality or psychiatric changes such as apathy, decreased motivation, emotional lability, irritability, anxiety and depression, and disinhibition, including temper flare-ups, aggression, cursing, and lowered frustration tolerance; certain psychiatric disorders are more likely to develop if damage changes the chemical composition of the brain; and,

i.  Traumatic epilepsy, which can result in seizures immediately after the injury, within the first year of the injury, or it can surface years later.

17

80. Of the numerous symptoms of TBI addressed above, Muna currently presents with the following:

   a. Headaches;

   b. Changes in sleep patterns;

   c. Difficulty going to the bathroom while experiencing headaches;

   d. Communication and language deficits, such as difficulty speaking and understanding speech, difficulty performing certain very common actions (like brushing one's teeth), slow hesitant speech and decreased vocabulary.

   e. Functional deficits, such as impaired ability with activities of daily living such as dressing, brushing her teeth, changing her bandages, cleaning her wound and stitches, bathing, eating, problems with organization, shopping (which led Muna's friends and family to have to go out of their way to ensure Muna had what she needed), and the inability to drive a car or operate machinery (it took about 3 weeks before Muna was able to drive again).

81. As a result of her injury, Muna was prescribed an extremely strong opiate, Oxycodone, which she was hesitant to take because of the high risk of becoming addicted to the substance. Resultingly, Muna took less than was prescribed and therefore experienced additional pain as a result of being unwilling to risk becoming addicted to a controlled substance that she was only taking on account of Defendants' unlawful imposition of force.

18

82.   The first time Muna got into her car after being injured, she was extremely traumatized. When she got into her car, she was forced to remember what life was like before her injury. For months after her injury, Muna would cry in her car. Muna was traumatized enough by these experiences to dispose of her vehicle despite the financial losses and loss of equity this entailed.

83.   Muna now has symptoms that are consistent with post-traumatic stress disorder ("PTSD"). In the Fall of 2020, Muna went to a haunted house with her friends, and she had a terrifying experience as a result of her PTSD. Muna did not know the haunted house would have loud bang noises, and she fell to the floor in terror the first time she heard one such noise at the haunted house. Muna was asking for help, but she and her friends were too far into the haunted house be able to turn around and find the entrance. Muna's friends were forced to console her the best they could under the circumstances. Muna and her friends then held hands the entire way to the exit.

84.   Since her injury, Muna's social life has decreased drastically, as she now finds herself uneasy in crowds or social settings as a result of the trauma that accompanied her injury.

## CLAIMS FOR RELIEF

85.   Defendant Doe's unnecessary and excessive use of force violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures.

86.   Defendant Doe's unnecessary and excessive use of force violated Plaintiff's Fourteenth Amendment rights to due process by depriving Muna of liberty, quality

of life, and property without due process of law.

87.   Defendant Doe's unnecessary and excessive use of force constitutes a civil common law battery under Minnesota law.

88.   Defendant Doe's decision to fire a 40mm impact projectile indiscriminately into a crowd at head level constitutes negligence and negligence per se under Minnesota law.

89.   Defendant Doe's negligent actions caused Muna to experience extreme emotional distress. As such, Defendant Doe committed negligent infliction of emotional distress under Minnesota law.

90.   The City of Minneapolis' policies, customs, and/or practices were a driving force behind Defendant Doe's conduct which resulted in a violation of Muna's constitutional and/or statutory rights.

**Count 1: 42 U.S.C. § 1983 – Fourth Amendment Violation**

(Plaintiff v. Defendant Doe)

91.   Plaintiff realleges and incorporates herein by reference all preceding and subsequent paragraphs of this Complaint.

92.   By shooting Plaintiff in the forehead with a rubber bullet, Defendant Doe violated Plaintiff's constitutional right to be free from unreasonable seizures and excessive force.

93.   In determining what level of force, if any, is appropriate under the Fourth Amendment, the Court must look to the objective reasonableness of the officer's actions based on "the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

94.     In this case, Defendant Doe's actions were not objectively reasonable. Muna was not committing any crime, did not pose any threat to the safety of officers or others, and she was not actively resisting arrest or attempting to evade arrest by flight.

95.     Courts should also consider "the availability of alternative methods of capturing or subduing a suspect." *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) (internal citations omitted).

96.     In this case, Defendant Doe could have captured or subdued Muna by literally any other means. They could have used verbal commands, handcuffs, etc., but instead opted to shot Muna with a 40mm impact round in the skull.

97.     Plaintiff suffered serious harm as a direct and proximate result of Defendants' actions. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

## Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Plaintiff's Due Process Rights

(Plaintiff v. Defendant Doe)

98.     Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

99.     "[S]tate statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Buckley v.*

*Ray*, 848 F.3d 855, 864 (8th Cir. 2017).

100.    Plaintiff also had a liberty interest under Minn. Stat. § 629.32 to be free from "any more restraint than is necessary for her arrest and detention."

101.    Minn. Stat. § 629.32 confers extra natural liberties on Minnesotans by making them free from all unnecessary force from police officers even when the force used is considered reasonable under the Fourth Amendment's due process standard.

102.    Moreover, Plaintiff's liberty interest was harmed when she was struck by a 40mm impact round in that she lost consciousness, was involuntarily transported to the hospital where she remained unconscious for a significant period of time, and she subsequently needed to attend physician appointments and other newfound obligations that resulted directly from the injury she sustained on May 26, 2020.

103.    Plaintiff's quality of life has decreased since being injured on May 26, 2020. This decreased quality of life implicates the due process clause of the Fourteenth Amendment.

104.    Plaintiff never presented a risk to officers, as she was merely going to retrieve her friend's parked car when Muna was shot by a 40mm impact round.

105.    Plaintiff was not involved in the civil unrest that occurred outside of the Third Precinct on May 26.

106.    Plaintiff was far from the front lines of the protest when she was struck. Muna was across a city street, but police were shooting 40mm impact rounds indiscriminately in all directions.

107.  Plaintiff and her group immediately left the area when they determined that civil disturbance was imminent, leaving their car behind in order to avoid any involvement.

108.  When Plaintiff returned to the area to retrieve her friend's vehicle, she carried no weapon and showed no indication of disturbing the public peace in any way.

109.  In a video that captured the shooting of Muna, Muna can be seen frantically looking for her sister and flinching in fear at the time that she was struck.

110.  The deployment of 40mm less-lethal rounds is only authorized when used to incapacitate a violent or potentially violent subject.

111.  Plaintiff was never violent and did not demonstrate the potential of becoming violate when she was struck by the 40mm less-lethal round.

112.  Plaintiff was a mere face in the crowd of fleeing protestors, and the relevant MPD Policy guideline prohibits the deployment of 40mm launchers for crowd management purposes. Use of Force § 5-317(III)(D).

113.  When a defendant acts deliberately, an objective standard is appropriate in the context of excessive force claims brought pursuant to the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015).

114.  Whether the force used against an individual violated substantive Due Process rights under the Fourteenth Amendment turns on "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the

officer; and whether the plaintiff was actively resisting." *Kinglsey*, 576 U.S. at 397.

115. Defendant Doe did not attempt to de-escalate the confrontation and instead resorted immediately to using excessive and indiscriminate less-lethal force.

116. There was no basis for Defendants to *reasonably* perceive that he or his fellow officers were in danger, given that Plaintiff was unarmed and running away from the area of conflict amid a crowd of fleeing individuals.

117. Officers did not attempt to temper or limit the amount of force used.

118. Officers also failed to provide Plaintiff with medical assistance.

119. Officers failed to properly photographically document Plaintiff's injury.

120. The Minneapolis Police Department's use of force was unnecessary and unreasonable.

121. Plaintiff suffered serious harm as a direct and proximate result of Defendants' actions. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

## Count 3: *Monell* Liability

(Plaintiff v. Minneapolis)

122. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

123. MPD's Policy Manual provides that the Mayor is "vested with all the powers of said city connected with and incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its police force,

subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care and custody of all public property connected with the Police Department of the City." MPD Policy Manual § 1-301 (citing City Charter reference-Chapter 6, § 1).

124.   The Mayor, the City Council, and the Police Chief had final policymaking authority with regard to establishing written policies and training/supervision programs governing the conduct of MPD officers performing policing functions on behalf of the City.

125.   The Mayor, the City Council, and the Police Chief established and/or approved of MPD's written policies and training governing the conduct of MPD officers performing policing functions.

126.   The written policies and training established and/or approved by the Mayor, the City Council, and the Police Chief constituted the City's official policy and were the moving force behind and caused Plaintiff's injuries.

127.   The City, acting by and through its Mayor and/or other policymakers, had knowledge of MPD's unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

128.   The City, acting by and through its Mayor and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that

would result from MPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

129.   On or prior to May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that condoned the targeted use of less-lethal weapons, including rubber bullets, on areas of a suspect's body likely to cause death or serious physical injury.

130.   On or before May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that failed to provide for the safety of bystanders during civil disturbances, including but not limited to allowing the use of 40mm less-lethal impact rounds in densely populated areas despite knowing that such rounds constitute "deadly force" when they impact certain areas of the body.

131.   On or before May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that failed to provide for the safety of bystanders during civil disturbances, including but not limited to allowing the use of "deadly force" when deadly force is not justified. Instances of this, in addition to the use of 40mm impact rounds,

include the City's decision to train MPD to use of deadly chokeholds and other holds that lead to positional asphyxiation when deadly force is not justified.

132. On or before May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that failed to provide for the safety of bystanders during civil disturbances, including but not limited to allowing MPD to fire less-lethal 40mm impact projectiles in crowd control and civil disturbance settings.

133. On or before May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that failed to discipline MPD officers who discharged 40mm less lethal projectiles indiscriminately into a crowd or at face level.

134. On or before May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that failed to discipline MPD officers who used excessive force in violation of the Fourth Amendment.

135. On or prior to May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required that officers refrain from submitting police reports that

criticize their fellow officers' use of force even when an officer's use of force was excessive.

136.    On or prior to May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that condoned the use of unnecessary restraint for arrest and detention, including deployment of less-lethal weapons, on subjects who could be controlled by other means in a manner that would create less risk for the public, officers, or any subjects involved.

137.    City officials were and continue to be especially tolerant of unauthorized and random use of force by MPD officers using crowd control methods during civil disturbances, even when suspicions of involvement in illegal activity prove to be ill-founded, and even when those suspicions cannot reasonably lead the officers to believe an individual was involved in illegal activity.

138.    As a direct and proximate result of Minneapolis' actions and inaction, Plaintiff suffered serious harm. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

## Count 4: *Canton* Liability

(Plaintiff v. Minneapolis)

139.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

140.   Minneapolis failed to properly train or modify its training to Defendant Doe and its other officers, including but not limited to matters related to crowd management or dispersal, and intervention in the excessive use of force during civil unrest by fellow officers.

141.   Crowd control, using force to manage civil disturbances, and intervening in the use of force is a usual and recurring situation which Minneapolis law enforcement officers and other agents encounter on a regular basis.

142.   Minneapolis used force to manage alleged civil disturbances in 2015 after MPD killed Jamar Clark and again in 2016 after police killed Philando Castile.

143.   Minneapolis was aware of a need for more and different training. Minneapolis specifically knew that its officers needed training regarding the use of less-lethal rounds and was required to provide its officers with such training.

144.   With deliberate indifference to the rights of citizens, Minneapolis failed to provide adequate training to its officers on the use of less-lethal force, including but not limited to 40mm impact launchers.

145.   On or before May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that failed to train MPD officers not to discharge 40mm less-lethal projectiles indiscriminately into crowds (regardless of whether the projectiles are being used for crowd control purposes).

146.    On or before May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that failed to train MPD officers not to discharge 40mm less-lethal projectiles at face level.

147.    On or before May 26, 2020, Minneapolis, with deliberate indifference to the rights of Minnesota residents, bystanders, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of policies, customs, patterns, or practices that failed to supervise MPD officers who are permitted to discharge 40mm less lethal projectiles to ensure that such persons do not indiscriminately fire into a crowd or fire into a crowd at face level.

148.    With deliberate indifference to the rights of citizens, Minneapolis failed to provide adequate training to its officers on identifying and monitoring individuals for head injuries after those individuals have been struck in the head by less-lethal rounds. Minneapolis failed to provide adequate training to its officers regarding the proper documentation of injury from 40mm less-lethal projectiles and the necessary rendering of medical assistance.

149.    Minneapolis was aware that deprivation of the constitutional rights of citizens was likely to result from its lack of training and the failure to modify its training.

150.    Minneapolis was deliberately indifferent to these risks and exhibited reckless disregard with respect to the potential violation of constitutional rights.

151.   The failure to train and/or appropriately modify training constituted official Minneapolis policies, practices, or customs. Minneapolis' failure to train and/or modify training was behind the Defendant Officers' acts and omissions towards Plaintiff.

152.   As a direct and proximate result of Minneapolis' acts and omissions, Plaintiff suffered injuries, experienced pain and suffering, and now suffers from chronic and unrelenting migraines, facial pain, and anxiety.

## Count 5: Minn. Stat. § 466.02 – Battery

(Plaintiff v. Minneapolis & Defendant Doe)

153.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

154.   Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

155.   Minnesota law defines the tort of battery "as an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

156.   Defendant Doe committed a battery by striking Plaintiff on the forehead with a 40mm less-lethal projectile. This constitutes an unwanted and offensive contact that lacked justification or excuse.

157.   Defendants Doe willfully or maliciously subjected Plaintiff to excessive force during an unauthorized seizure in a manner that violated Plaintiff's constitutional rights and which violated the plain language of Minn. Stat. §§ 629.33 and 629.32.

158. Because Defendant Doe acted intentionally and with reason to believe that using such force without warning or provocation was legally prohibited and is not entitled to official immunity.

159. Minnesota law holds that "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." Minn. Stat. § 466.02. This is subject to several exceptions including, pertinently, "claim[s] based upon an act or omission of an officer or employee, *exercising due care*, in the execution of a valid or invalid statute, charter, ordinance, resolution, or rule." Minn. Stat. § 466.02, subd. 5 (emphasis added).

160. Defendant Doe failed to exercise due care when they discharged a less-lethal round indiscriminately into a group of individuals, at face level, for crowd management purposes. Minneapolis is not exempt from liability.

161. As a direct and proximate result of Defendant Doe's actions, Plaintiff suffered serious harm. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

## Count 6: Minn. Stat. § 466.02 – Negligence

(Plaintiff v. Minneapolis & Defendant Doe)

162. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

163. Defendant Doe "fail[ed] to act as a reasonable and prudent police officer in the same or similar circumstance" when they fired less-lethal rounds at Muna as she

attempted to find her parked vehicle.

164.  Defendant Doe acted under police duty when deployed in Minneapolis.

165.  Defendant Doe owed Muna a duty not to fire a 40mm impact round indiscriminately into a crowd.

166.  Defendant Doe owed Muna a duty not to fire a 40mm impact round into a crowd at face level.

167.  The two aforementioned duties are expounded in official Minneapolis policy documents that were in force at the time of Defendant Doe's actions. As such, a violation of these duties constitutes negligence per se.

168.  Defendant Doe breached these duties by firing a 40mm impact round indiscriminately into a crowd at face level.

169.  As a direct and proximate result of Defendant Doe's negligent actions, Muna suffered bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

### **RELIEF REQUESTED**

Plaintiff respectfully requests that this Court grant the following relief:

A.  As to Counts 1 and 2, a money judgment against Defendant Doe for compensatory, special, and punitive damages, and punitive damages together with costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

B.  As to Counts 3 and 4, a money judgment against Defendant City of Minneapolis for compensatory and special damages in an amount to be determined together with

costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

C.     As to Counts 5 and 6, a money judgment against Defendant Doe and/or the City of Minneapolis for compensatory and special damages in an amount to be determined together with costs and disbursements, including prejudgment interest.

D.     Appoint a receiver or similar authority to ensure that the City of Minneapolis properly trains, supervises, and disciplines its police officers.

E.     Grant such other relief as may be just and reasonable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Procedure.

DATED: March 27, 2022          Respectfully submitted,

/s/ Nico Ratkowski

NICO RATKOWSKI
MN Attorney ID: 0400413
Contreras & Metelska, P.A.
200 University Avenue W., STE 200
Saint Paul, Minnesota 55103
P: (651) 771-0019
F: (651) 772-4300
nico@contrerasmetelska.com

*Attorney for Plaintiff*

## <u>VERIFICATION OF COMPLAINT</u>

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the attorneys for Plaintiff in this case.

2. That he affirms the truth of the contents thereof upon information and belief, and he believes same to be true, and he further states that the sources of this information and belief are documents provided to him by Plaintiff, Defendant(s), and/or third parties.


DATED: March 27, 2022                    Respectfully submitted,

                                         /s/ Nico Ratkowski
                                         NICO RATKOWSKI
                                         MN Attorney ID: 0400413
                                         Contreras & Metelska, P.A.
                                         200 University Avenue W., STE 200
                                         Saint Paul, Minnesota 55103
                                         P: (651) 771-0019
                                         F: (651) 772-4300
                                         nico@contrerasmetelska.com

                                         *Attorney for Plaintiff*